Ramona **BARTLETT,** Plaintiff,

v.

**UNITED STATES of America, and Michael P.W. Stone, Secretary, Department of the Army, Defendants.**

No. CS–92–0273–CI.

United States District Court,
E.D. Washington.

Oct. 14, 1993.

Kenneth Isserlis, Lee & Michaud, James J. Gillespie, Spokane, WA, for plaintiff.

Carroll Gray, Asst. U.S. Atty., Spokane, WA, for defendants.

OPINION INCORPORATING FINDINGS AND CONCLUSIONS FOLLOWING BENCH TRIAL, DIRECTING ENTRY OF JUDGMENT FOR PLAINTIFF ON CERTAIN DISPARATE TREATMENT CLAIMS, AND DISMISSING FTCA CLAIM

IMBROGNO, United States Magistrate Judge.

Plaintiff Ramona Bartlett claims the Department of the Army Corps of Engineers unlawfully discriminated against her on the basis of gender in violation of Title VII of the Civil Rights Act (42 U.S.C. § 2000e–2(a)), by unlawfully pre-disqualifying her from dual-rate and temporary work leader positions, assigning her to menial and unsafe work tasks, issuing an abuse of sick leave reprimand without cause, and requiring her participation in an individual development program (IDP). She further claims Defendant's conduct was in retaliation for a complaint she filed with the Equal Employment Opportunity Commission (EEOC) in violation of 42 U.S.C. § 2000e–3. Finally, Plaintiff alleges Defendant's acts caused the infliction of emotional distress in violation of the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2671, *et seq.* Attorneys Kenneth Isserlis and James Gillespie represented Plaintiff; Senior Assistant United States Attorney Carroll Gray represented Defendant, assisted by Jim Brent, counsel with the Army Corps of Engineers, Joree Brownlow, formerly counsel with the Army Corps of Engineers, and legal intern Ron Grant. The parties consented to proceed before the United States Magistrate Judge.

On August 6, 1993, the court denied in part and granted in part Plaintiff's Motion for Partial Summary Judgment and Defendant's Motion to Dismiss. (Ct.Rec. 58.) At that time, Plaintiff demonstrated a prima facie claim of sex discrimination as to disparate treatment. However, the court granted Defendant's summary Motion to dismiss certain claims involving sexual harassment, disparate treatment based on a denial of training opportunities, reprisal claims under 42 U.S.C. § 2000e–3, and the claim for intentional infliction of emotional distress. In addition, Plaintiff's FTCA claim based on the negligent infliction of mental distress survived summary proceedings and were explored with her remaining sex discrimination claims during a seven-day bench trial.

### FACTS

At the time of trial, Ms. Bartlett was 36 years old, divorced and the mother of two sons, ages 17 and 15. She was a resident of

Hermiston, Oregon. On the basis of her doctor's recommendation, Plaintiff last worked at McNary Dam on August 31, 1992. She is on leave-without-pay status.

In October 1980, Ms. Bartlett began a training program at the China Lake Naval Station in California as an electrician apprentice. At the end of 18 months, her training focused on high line tasks rather than residential wiring. She attained journey level in April 1984, after compressing a four-year program into three and one-half years. Plaintiff was assigned to work on a line crew. During her tenure at China Lake, Plaintiff received highly satisfactory job performance evaluations and eight awards, including some that were monetary. (Tr. at 622.)

Months after attaining journey status, Ms. Bartlett quit her job after her supervisor demanded sexual favors and threatened to harm her on the job if she refused. Although she made an initial complaint to the EEOC, nothing was done until months later when the EEOC learned of similar complaints from five other women. The EEOC then contacted her and requested that she file a complaint. The complaint ultimately was settled in her favor for $11,000. Plaintiff was offered, but refused, reinstatement. During this time, she experienced some ulcer problems which were controlled with Tagamet.

After leaving government employment, Ms. Bartlett began work as an office manager in a store owned by her mother, an interior decorator in Ridgecrest, California. She also did some incidental residential electrical work on the side, working an extra 10 days a month. During that period of employment, she was divorced from her husband, the father of her two sons. (Ex. 56.) At the same time, her father became terminally ill and needed his spouse's support. To free her mother of financial responsibilities, Plaintiff applied for a job as an electrician at McNary Dam, Umatilla, Oregon, and was hired by her future supervisor, Chet Kimball. She start-ed work on February 6, 1989. She represented to management she had had no hydro experience, but was assured the necessary training would be provided throughout the first year of employment. Management had hired non-hydro electricians in the past, and they "fit in pretty easy." (Ex. 51.)

Plaintiff was the only female electrician among four permanent and additional temporary electricians at McNary. Of the 83 employees at the Dam, ten were women and Plaintiff was the only woman in a wage-grade position. (Ex. 31.) Plaintiff understood her on-the-job training would continue for a full year. However, after her first month at McNary, she was assigned to tasks on her own and received no more on-the-job training. She stated it would take her longer than other electricians to complete job assignments because she was not acquainted with the equipment or its location. However, once the equipment was located, she stated she had sufficient training to perform the task. Ms. Bartlett admitted supervisors[1] criticized her for taking extra time. Her work assignments included preventive maintenance and responding to trouble reports on the X–J breakers, generators and fish screens.

Little evidence was presented regarding Plaintiff's performance during the first year of her employment. Mr. Kimball called her at home shortly after the October 1989 earthquake in San Francisco to invite her to share a room with him if she were to accompany him to California on Corps business. Ms. Bartlett refused. Shortly thereafter, she was assigned by Mr. Kimball to a lengthy filing project in his office. He testified to doing so because he knew Ms. Bartlett had secretarial experience and because he was afraid that if he asked the male electricians, they would refuse to do such a task. During that time she received no electrician work assignments.

In February 1990, Plaintiff was the lead electrician to work on a fish pump transform-

---

1. Supervisors at McNary included Chet Kimball who hired her, succeeded by Dan Slead and Herb Scheuerlein, who rotated on a temporary supervisory basis during the spring and summer of 1991. Mr. Slead became the permanent su-pervisor in October 1991. The Project Manager in 1989 was Peter Gibson. In June 1991 he was succeeded by acting project manager Jack Allison.

er. She worked overtime hours with electricians Messrs. Dimick and Frazier. In response to the successful completion of that assignment, all three were presented an award by acting project manager Jack Allison.

Ms. Bartlett's first performance evaluation was completed in July 1990 after 18 months on the job. (Ex. 104.) Her supervisor, Chet Kimball, called her into his office to present the evaluation. During the fifteen minute meeting, Mr. Kimball explained the criticisms noted on the evaluation stemmed from the fact she was not completely familiar with the project.[2] Other than that criticism, Mr. Kimball did not indicate her performance was deficient, but told her she was doing a good job for the time she had been at the project.

In October 1990, Plaintiff's father and brother-in-law died within the same week, necessitating the use of leave time. A month later, Plaintiff married Dar Bartlett. Immediately after they were married, Mr. Bartlett quit his job and began to abuse alcohol. On December 27, Plaintiff was the victim of spousal abuse,[3] resulting in Mr. Bartlett's incarceration for 30 days. After his release in January 1991, Mr. Bartlett stayed in a camper located on Plaintiff's property. Plaintiff served him with dissolution papers and a temporary restraining order. Soon after, he went to the barn where he accidentally shot himself in the stomach while trying to remove a loaded gun from a saddle rack. He was hospitalized in critical condition for several weeks. Plaintiff used accumulated leave to be with him in the hospital at Portland, Oregon.

In April 1991, Ms. Bartlett was assigned to work on a navigation lock outage with electrician Loren Frazier. The two electricians discovered what they perceived as violations of the Occupational Safety and Health Act (OSHA) involving a disconnect for a 480 volt unwatering pump. The violations were presented to management at the monthly safety meeting. When management dismissed the need to change the existing disconnect, the matter was reported by Ms. Bartlett and Mr. Frazier to the Walla Walla safety office. Personnel from that office responded on that day and the disconnect was added to the equipment. Ms. Bartlett also complained that after she reported the violation, management began to scrutinize her work carefully, including reviewing her performance on completed jobs. (Ex. 37.)

In April 1991, Ms. Bartlett began experiencing stomach problems which culminated in upper gastric surgery in June 1991. (Ex. 62.) Upon being hospitalized, Donna Sturgeon, a Corps personnel employee, visited Plaintiff at the hospital and presented her with a sick leave form, advancing 240 hours of sick leave which later was approved by Corps management. Plaintiff returned to ten weeks of light duty work on July 29, 1991, until mid-October. The light duty later was extended by her physician, Robert J. Rakozy, D.O., on October 26, 1991, for an additional four weeks to mid-November.

On July 29, 1991, Ms. Bartlett was assigned by her temporary supervisor, Herb Scheuerlein, to a forty-hour week sorting and identifying electrical parts in the storage room. That assignment continued for one month to August 29. The parts left to be sorted were heavy, weighing up to 50 pounds. She did no electrical work during this period.

On August 3, 1991, Ms. Bartlett received oral notice from Mr. Kimball that she had failed her performance evaluation. The appraisal was supported by two sheets of information detailing her deficiencies on specific

---

**2.** The evaluation contained the following remarks:

1. Diagnose & Repair: Mona needs to sharpen up her electrical skills and use more effort in learning the project equipment.

2. Install & Mod: Mona needs to make more effort in learning the project equipment.

3. PM's: Mona needs to make more effort in learning the project equipment.

4. Rpts & Docs: Mona does good work in this element.

5. Safety: Mona is satisfactory in this element. She participates well in meetings and other safety activities.

The summary rating level was "fully successful." Two higher ratings as well as two lower ratings were possible.

**3.** Her spouse threw Plaintiff through a sliding glass door.

job assignments. The information had been provided by Messrs. Slead and Scheuerlein; there were no criticisms on the list from Plaintiff's co-workers. Ms. Bartlett refused to sign the evaluation but investigated each instance against her time cards and the clearance reports. Ten of the items could not be attributed to her because she was not on the job site. Thereafter, management eliminated those ten items from the list. The evaluation was signed by Messrs. Hokanson and Kimball, even though neither had observed her work during the year.

On August 15, Mr. Scheuerlein advised her to sign the evaluation, telling her that management was watching her and she needed to decide whether to sign the evaluation. He stated he had failed an item on an evaluation, but that the failure did not result in any adverse consequence. He also stated it was time for her to "fish or cut bait," but did not elaborate on what he meant.

On August 21, 1991, Ms. Bartlett met with Mr. Kimball to review the modified job evaluation.[4] (Ex. 16.) Mr. Kimball mentioned to Ms. Bartlett that if he graded her down in a critical area, he could place her on a Personal Improvement Plan (PIP). Two errors provided the basis for the "not met" in the critical performance area of installation and modification, although management was not able to produce any documentation of those errors. (Tr. at 534.) First, Ms. Bartlett was held responsible for hot wires left exposed in the map/file room and, second, for improperly wiring a turbine pit alarm. She attempted to explain her involvement in both matters, but Mr. Kimball refused to listen and ordered her to sign the evaluation. He did not advise her she could protest the evaluation. Ms. Bartlett signed it and then met with her shop steward who advised her about the grievance procedure. She then consulted Bob McAuslin and filed a first step union grievance.

Attached to the evaluation was a personal improvement plan (PIP) imposed on Plaintiff to secure the necessary training to improve her performance. The PIP consisted of both course work and on-the-job training and was to be supervised by Mr. Kimball. Four hours of work time on a weekly basis could be used to complete the plan. (Ex. 22.)

On August 29, 1991, Mr. Scheuerlein advised Plaintiff she would be receiving a formal notice regarding abuse of her leave. (Ex. 147.) That same day, Ms. Bartlett was assigned to secure oil samples from seven vaults which housed transformers. She asked Mr. Scheuerlein to send an employee to the job site to spray the vaults so that she would not be endangered by the spiders. He refused, told her again it was time to fish or cut bait and that she was in enough trouble. (Tr. at 687.) She worked on the task for three days and then was unable to continue because of the numerous spiders she was forced to remove prior to obtaining the samples. She was bitten by a spider during this job assignment. While an employee at China Lake, Plaintiff had been bitten by several black widow spiders which left her in a coma for three weeks. On the third day, Byron Hall, a McNary employee, found her in the midst of a panic attack and took her back to the office. When she refused to return to

---

4. The evaluation, signed by Chet Kimball and Oscar A. Hokanson, contained the following comments:

1. Diagnose & Repair: Although Mona has not failed this element her work shows that she needs much improvement.

2. Installation & Modification: Mona has failed this element due to not properly securing some hot wires in the map file room's new power job and improperly wiring the main unit turbine pit warning alarms. Along with general observation that she needs to improve her electrical knowledge.

3. Preventative Maintenance: Mona has met this element, but again her work shows she needs to improve her electrical skills and knowledge.

4. Reports and Documentation: Mona does a good job in keeping up with her paper work.

5. Safety: Mona was bitten by a spider which was not due to any carelessness on her part so she exceeds this element.

Items one through three are critical elements; items four and five are not critical elements.

The evaluation also noted: "A training development plan to help Mona increase her electrical knowledge is going to be used. She will be given formal training using Technical Publishing System's books and OJT on prints and project equipment. She will be evaluated once a month to check her progress."

complete the job, Mr. Scheuerlein did not construe her refusal as insubordination.

On August 31, Ms. Bartlett was reassigned full-time to Elevation 320 to sort parts until September 7. On September 7, Mr. Scheuerlein assigned her to the annual preventive maintenance work on the X–J breakers, even though Plaintiff was still assigned to light duty. The work did not constitute light duty.

On September 1, Ms. Bartlett met to discuss the first step grievance concerning her job evaluation. Plaintiff was present with union representative Bob McAuslin, and management representatives, Messrs. Al Hokanson, Scheuerlein, Kimball and Allison. Mr. Allison issued a written statement addressing the three issues encompassed by the grievance: (1) The lack of a six-month appraisal; (2) the fairness of the performance evaluation; and (3) the appropriateness of the training encompassed by the PIP. Mr. Allison concluded the lack of the 6–month appraisal had no bearing on the fairness or objectivity of the annual performance appraisal. He also concluded the performance evaluation had been appropriately completed by Mr. Kimball because he had been her supervisor for 8 months during the evaluation period. Finally, Mr. Allison concluded the PIP was appropriate given her failure of a critical element. (Ex. 23.) In an attempt to induce Plaintiff to sign the evaluation, Mr. Allison advised her that a failed evaluation could be explained to a future employer as the result of a bad relationship with the supervisor conducting the evaluation. (Tr. at 654.) Mr. McAuslin advised Ms. Bartlett to take the matter to a second step grievance.

On September 9, 1991, an abuse of sick leave letter was sent to Ms. Bartlett. (Ex. 12.) The letter noted her crew leader had discussed her sick leave usage on August 27, 1990, and that the discussion was noted on her 7B card. Later, Ms. Bartlett had continued to use most of her accumulated leave, necessitating an advance of 30 days' sick leave to cover her hospitalization in June 1991. After her return to work, it was noted Plaintiff continued to use all her earned sick leave. Additionally, her annual leave balance was very low. Plaintiff was advised that any further use of leave would have to be pre-approved by her supervisor and all medical leave would have to be supported by a doctor's certification. The leave abuse program was effective for six months. The warning was not considered adverse action but could lead to adverse action. Ultimately, the leave abuse letter was withdrawn from Plaintiff's personnel file.

On September 10, 1991, Ms. Bartlett had additional day surgery for her stomach condition. She was warned by her physician that she should quit her job or she would risk losing the rest of her stomach. She self-referred to Dr. James Farnes, a psychologist, available to employees under the Corps of Engineers' Employee Assistance Plan. In November 1991, Dr. Farnes reported Plaintiff had attended five sessions. Coincident with her first session, she also acquired the support of her union representative and an investigation was started by the EEOC. With this support, Ms. Bartlett reported a clear decrease in depressive symptoms, sleep and appetite disturbances and generalized anxiety. It also was noted the transfer of her supervisor to another unit decreased her anxiety and sense of threat. (Ex. 53.) She continued to see Dr. Farnes until January 1992 when her treatment was discontinued because of clear improvement in her symptoms. (Ex. 59.)

On September 16, 1991, in response to the leave abuse letter, Ms. Bartlett filed a complaint for gender discrimination with the EEOC. An investigator met with Mr. Kimball on October 3, 1991, to discuss the use of the leave abuse letter. The evidence indicates the letter had been used successfully in the past to correct leave abuse by male employees. Mr. Scheuerlein and Mr. Slead acknowledged Plaintiff's attendance had improved during the preceding month. The matter was settled when the investigator suggested the issue be reviewed in six months and that if Plaintiff's attendance was satisfactory, the leave abuse letter would be removed from her personnel file. Ms. Bartlett agreed and the EEOC file was closed on October 22, 1991. (Ex. 39.)

On October 16, 1991, Ms. Bartlett met with Union Vice President Dennis Thomas, and Messrs. Slead and Allison to resolve the second step grievance. After being advised Plaintiff had not been given a mid-year appraisal as mandated by the union contract (UPTO 12.6) prior to an unsatisfactory performance evaluation, Mr. Allison agreed to change the performance evaluation to satisfactory.[5] The PIP was renamed "individual development plan" (IDP) but otherwise remained unchanged in its content. The plan was to be supervised by Mr. Slead rather than by Mr. Kimball. (Ex. 21.) Failure by Ms. Bartlett to complete the plan would result in adverse action.

During the fall of 1991, Ms. Bartlett completed the course work with high scores. Management did not provide any formal on-the-job (OJT) training but testified at trial the OJT aspect of the IDP was "informal," to the degree that electricians who provided the training were unaware of their role as trainer.

On October 21, 1991, Ms. Bartlett returned to light duty for an additional month after having to return to the hospital to have her surgical incision examined. Again she was assigned to sorting parts in Elevation 320, an assignment which continued 36 hours per week until December 17, 1991. The remaining 4 hours were spent on completing her IDP. Some items weighed in excess of 20 pounds. Utility personnel were involved only to the extent of building shelves for storage.

On November 14, 1991, Mr. Slead completed an evaluation form for Plaintiff for the position of power plant electrician, a new job that Plaintiff was seeking with the Trojan

nuclear plant. Mr. Slead rated Plaintiff as average in 19 categories and above average in four categories. (Ex. 19.)

On December 11, 1991, a job announcement was issued for the position of dual-rate electrician.[6] (Ex. 25.) The application period commenced Wednesday, December 11, and closed Thursday, December 26, 1991. Mr. Slead personally distributed copies of the announcement to three of Plaintiff's male co-workers, Messrs. Knisely, Medley and Butterfield. No copy was provided to Plaintiff who was absent from work that week. (Ex. 11.) When Plaintiff returned to work on Monday, December 16, the announcement had disappeared from Mr. Slead's desk, so it was not given to Plaintiff. Ms. Bartlett was at least as well-qualified for the position as Mr. Butterfield.

On December 17, 1991, Ms. Bartlett was assigned by Mr. Slead to work on a trouble report involving the X–J breakers. (Ex. 5.) No electrician was assigned to go with her, even though a second electrician was considered necessary for safety reasons and was mandated by regulation. (Ex. 1.) She checked with the operator to determine if the breaker could be shut down and was informed it could not be because of power demands. Thus, Ms. Bartlett was unable to do any repairs on the breaker.

On Wednesday, December 18, 1991, Ms. Bartlett delivered a release from her doctor regarding her light-duty status. (Ex. 41, at 16.) That same date, Plaintiff and her male colleagues met with Mr. Slead to discuss the dual-rate position. Mr. Slead encouraged the employees to apply, advising them that if no one did, a temporary work leader would be appointed to perform the same duties

---

5. The performance rating indicated the following:

| | | |
|---|---|---|
| 1. | Diag. & Repair | Met |
| 2. | Install. & Modif. | Met |
| 3. | Prev. Maintenance | Met |
| 4. | Reports & Doc. | Met |
| 5. | Safety | Exceeded |

The comments noted the following: "Although we show Ramona as not failing any of the elements of her performance standard, her work indicates she needs to improve her journey person level skills and knowledge. This is indicated by two documented errors on her part and the

need to have more than normal help from some of the other journeyman electricians. Because of her need to improve we have developed a comprehensive training plan for her which will be administered over the next year with a 6–month evaluation about March."

The conclusion rated Plaintiff as "fully successful." (Ex. 18.)

6. A dual-rate electrician performs mostly electrician duties, but may be assigned to supervisory duties when vacancies occur and would be paid accordingly. The increase in pay amounted to $.85 to $1.35 an hour.

without the benefit of the extra pay, a situation which could lead to problems with the union. After the meeting, Ms. Bartlett told Mr. Slead she was concerned about applying for the job because of her participation in the IDP. Specifically, she felt a conflict might ensue because of her continuing supervision under the IDP. However, she requested a copy of the job announcement and the application in case she did decide to apply because she would need time to complete it. Mr. Slead stated he would get her the application, but never did. The evidence also demonstrates the announcement was not posted on the usual bulletin boards.

On Thursday, December 19, after a Christmas party, Ms. Bartlett stayed to assist in the cleanup. When she returned to the electrical shop, she overheard the other electricians talking about a meeting they had just left with Messrs. Allison and Slead to discuss the appointment of a temporary work leader for the remainder of the week following New Years Day. Mr. Butterfield related that management had stated an appointment would be made to cover for Mr. Slead while he was on leave during the holidays. Tom Medley, electrician, had asked management why Ms. Bartlett was not present and was told "Jack said she was not qualified." Mr. Knisely, electrician, asked if she had met the requirements of her performance appraisal, and was told by Mr. Slead that she was in a training program, so had not. Mr. Medley said he felt if she were a "journeyman, getting journeyman pay" she should have been at the meeting. Mr. Slead responded Plaintiff was not qualified. Messrs. Scheuerlein, Knisely, Medley and Butterfield were appointed to cover for Mr. Slead during his absence.

After learning about the meeting, Ms. Bartlett went to Mr. Slead's office. She was angry. When asked why she was not included in the meeting, Mr. Slead responded it was "no big deal" because she was not qualified.

Ms. Bartlett immediately contacted Dora Reyes, the EEOC advisor. Linda Nutt, EEOC counselor, was assigned by Ms. Reyes. to investigate the complaint. Ms. Nutt began that investigation on Monday, December 23. She concluded the failure to provide a copy of the dual-rate announcement was an EEOC matter, but that safety and work assignment concerns were union matters. (Ex. 43.)

On December 31, 1991, Mr. Slead approached the electricians to determine if any would volunteer to be temporary work leader on January 2 and 3, 1992. Ms. Bartlett volunteered, but Mr. Slead stated he would have to clear her appointment with Mr. Allison, because of the EEOC complaint. After checking with Mr. Allison and Paul Winborg, Chief of Operations, Plaintiff's offer was declined. Mr. Knisely was appointed.

On March 30, 1992, Ms. Bartlett suffered a severe emotional and stress attack after receiving a phone call from the EEOC. (Ex. 4.) That agency concluded Plaintiff had demonstrated a prima facie case of sex discrimination regarding the pre-disqualification issue on the dual-rate position. However, the EEOC also concluded management's reasons for excluding her from consideration were not pretextual.

On May 26, 1992, Ms. Bartlett was exposed to perchlorethylene and trichlorethylene while on the job. She was admitted to the hospital for observation overnight. Plaintiff was advised to remain off work for approximately two weeks. On May 29, 1992, Plaintiff had day surgery to repair the surgical incision which had resulted in scarring in the abdomen area. (Ex. 65.) On July 23, she requested a work release which was provided, and she returned to the dam.

Ms. Bartlett's mid-point review was held June 29, 1992, even though it had been scheduled for March 1992. (Ex. 20.) She had requested the presence of a union representative, but none was available since Mr. McAuslin was on leave. An EEOC representative was present, as well as Mr. Slead. The evaluation described two instances of poor performance. First, while Ms. Bartlett was the clearance holder on the annual maintenance of Unit 10, a brush was left out of a holder which was discovered on November 27, 1991, through a trouble report. Ms. Bartlett admits she had the clearance on that job, but contends it was done properly be-

cause nothing was amiss when she inspected the job after completing it. She confirmed that fact with her co-worker. Plaintiff further testified it was common for brushes to "pop out" on their own after a worker inspects the premises and that fact was not a reason for criticism on a job evaluation. Second, during the annual breaker maintenance, a blade retaining pin was left out on X–J[7] breaker two, and wooden exhaust tube covers were left in the X–J breaker 4 cubical. Both items were found during a semi-annual maintenance. Ms. Bartlett did not have the clearance on that job and had been taken to the hospital before the job was completed because she pulled some abdominal adhesions while using a wrench. (Ex. 4, 64.) Other male electricians were not "written up" for mistakes that occurred on jobs where the clearance was held by another electrician. All the critical elements on Ms. Bartlett's job performance evaluation were met, as well as noncritical elements.

During the summer of 1992, Ms. Bartlett was assigned with another electrician to do repair work on the "solar outhouses." She worked there on ten occasions. The work caused her extreme stress and the noxious gases made her feel sick. There is evidence other male electricians were not assigned to that duty on a regular basis.

On August 30, 1992, management assigned Herm Knisely to train Plaintiff on a crane. Mr. Knisely requested a set of criteria that should be accomplished during the training period. Management refused to suggest any criteria and reprimanded him for insubordination. After learning of the reprimand on August 31, Plaintiff suffered what she described as a nervous breakdown. She was examined by an Emergency Medical Technician (EMT) at the dam who suggested she go immediately to the hospital because of her pulse and blood pressure readings. (Ex. 78, at 5.) A request was made to Mr. Slead to transport Plaintiff, but he refused to allow her to leave until he cleared the request with Mr. Allison. About 20 minutes later, Ms. Bartlett was allowed to go to the hospital.

She was advised by her doctor not to return to work because of the effect of stress on her physical condition. She has not worked since that date, and remains on an administrative leave without pay status.

Since September 1992, Ms. Bartlett has been treated by psychiatrist Richard H. Johnson, M.D. His office notes indicate Plaintiff had a prior history of depression at age 17 and again at age 26. She had apparently fully recovered from these episodes prior to her employment with Defendant. Plaintiff's treatment with Dr. Johnson included psychotherapy. When seen initially, Ms. Bartlett was moderately to severely depressed. During the course of treatment, Ms. Bartlett has demonstrated gradual but very slow improvement, and as of February 1993 remained symptomatic. The working diagnosis was major depression, recurrent with hypomanic features, panic disorder, agoraphobia, claustrophobia and specific phobias. Dr. Johnson concluded Plaintiff would require extensive therapy, with no estimate of the date of recovery. Dr. Johnson also opined her level of emotionality and depression was such that it produced dysfunction in her daily living and rendered her totally incapable of returning to any employment. Dr. Johnson specifically noted as recently as January 1993 Plaintiff experienced a three-day fugue state and suicidal ideation, precipitated by the receipt of a sexually suggestive card from a party who had harassed her at McNary. Dr. Johnson opined Plaintiff's physical and mental conditions were the direct result of the circumstances and events of her work setting. Medical retirement strongly was recommended.

At trial, Ms. Bartlett described her experience at McNary in terms of an emotional "rape." She now suffers from sleep deprivation, loss of equilibrium, tremors, and an inability to digest food. She is unable to drive. She takes daily doses of several medications including trazadone, lithium, hybroxyzhydrochloride and klonophin, which cost approximately $350 to $600 monthly. She has not been awarded worker's compensation so

7. An X–J breaker is a breaker with 13,800 kilovolts of electricity. There are 14 such breakers located in a gallery. They deliver the power generated by the dam to the transformers operated by the Bonneville Power Administration.

supports her family with welfare benefits. (Ex. 34, 35.)

The court finds Ms. Bartlett to be a very credible and sincere witness. In contrast, the court does not find Mr. Knisely or Mr. Scheuerlein to be credible, except for Mr. Scheuerlein's volunteered testimony that Mr. Butterfield was not qualified to be a work leader and the fact it would take at least one year for a journey electrician to become fully familiar with the project.

## DISPARATE TREATMENT

■ Title VII of the Civil Rights Act makes it illegal for an employer "to discriminate against any individual with respect to his [/her] compensation, terms, conditions, or privileges of employment, because of such individual's ... sex." 42 U.S.C. § 2000e–2(a)(1). A plaintiff may show a violation of this statute by proving disparate treatment or the existence of a hostile work environment. *Sischo–Nownejad v. Merced Community College Dist.*, 934 F.2d 1104, 1009 (9th Cir.1991), citing *Intern'l Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396; other citations omitted. Disparate treatment involves intentional discrimination. A hostile work environment requires the existence of severe or pervasive and unwelcome verbal or physical harassment because of a plaintiff's membership in a protected class.[8] *Id.*

■ To prove disparate treatment, a plaintiff may assert either that the employer's challenged decision stemmed from a single illegitimate motive (i.e., sex discrimination) or that the decision was the product of both legitimate and illegitimate motives. *Sischo,* at 1109, citing *Price Waterhouse v. Hopkins,* 490 U.S. 228, 244–48, 109 S.Ct. 1775, 1787–89, 104 L.Ed.2d 268 (1989). With respect to disparate treatment, a prima facie case is established if there is sufficient evidence to give rise to an inference of unlawful discrimination. *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). Here, the court previously has determined Plaintiff established a prima facie case of discrimination by disparate treatment. The burden now shifts to Defendant to articulate a legitimate, non-discriminatory reason for the challenged action. *Id.*

■ Here, Defendant has provided testimony from management at McNary that Plaintiff's performance did not meet the standard required of a journey level electrician at a hydro plant. Thus, Defendant has asserted a legitimate, non-discriminatory reason for her job performance rating, participation in the IDP, and management's refusal to consider her for the dual-rate or temporary work leader positions. Furthermore, Defendant argues the decision to send Plaintiff the sick leave abuse letter was motivated by her attendance record rather than gender. Having advanced legitimate reasons for their management decisions, Plaintiff now must prove the articulated reasons are pretextual. *Id.; McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 804, 93 S.Ct. 1817, 1825, 36 L.Ed.2d 668 (1973). That burden is met "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Texas Dep't of Community Affairs,* 450 U.S. at 253, 101 S.Ct. at 1095.

Disparate treatment actions fall into two categories, single and mixed motive. In the single motive case, Plaintiff must ultimately prove the employer's conduct was motivated solely by intentional discrimination. *United States Postal Service Board of Governors v. Aikens,* 460 U.S. 711, 716, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983). "Proof of discriminatory motive ... can, in some situations, be inferred from the mere fact of differences in treatment." *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854, 52 L.Ed.2d 396 n. 15 (1977).

---

8. The court notes it granted Defendant's Motion to dismiss Plaintiff's claim involving sexual harassment to the extent the claims involved only a single incident. However, at the pretrial conference, counsel were reminded that elements of hostile environment still may be present. Thus, the issue is discussed a second time in this Opinion.

## SINGLE MOTIVE

One claim involves a single-motive analysis. Plaintiff's supervisor, Mr. Kimball, assigned her full-time to a filing project in his office. At trial, Mr. Kimball stated he made that assignment because he believed none of the male electricians would agree to do it.[9] The court finds, as a matter of law, that the filing assignment constituted disparate treatment, and Mr. Kimball testified his decision to assign the filing work to Plaintiff solely was because of gender, that she was less likely to refuse to do the task than her male colleagues. The court concludes this is direct evidence of discriminatory intent. *See Vaughn v. Edel,* 918 F.2d 517, 521 (5th Cir. 1990).

Defendant can counter direct evidence showing discriminatory motive on its face only by demonstrating, by a preponderance of the evidence, the act would have occurred as it did without regard to the protected characteristic. *Vaughn,* citing *Guillory v. St. Landry Parish Police Jury,* 802 F.2d 822, 824 (5th Cir.1986), *cert. denied,* 482 U.S. 916, 107 S.Ct. 3190, 96 L.Ed.2d 678 (1987). Defendant has not made such a showing.[10] Therefore, this incident must be viewed as persuasive evidence of discriminatory intent.

## MIXED MOTIVE

 In contrast to evidence motivated by a single factor, a mixed motive case requires Plaintiff to respond to the question whether, more likely than not, a protected characteristic "played a motivating part in [the] employment decision." *Price Waterhouse,* 490 U.S. at 244, 247 n. 12, 109 S.Ct. at 1787, 1789 n. 12. If Plaintiff meets that burden, Defendant is absolved from liability if it is proven the decision would have been the same even if the characteristic had played no role. *Id.* at 243, 109 S.Ct. at 1786.[11]

Evidence of events offered by Plaintiff involves an analysis of Defendant's intent with respect to these events under a mixed motive analysis. First, Plaintiff argues discrimination is demonstrated by Defendant's job performance evaluation dated August 1991 and the requirement she participate in an individual development plan (IDP). Defendant responds that the ratings were based on Plaintiff's unsatisfactory performance and were not motivated by gender discrimination. To be absolved of liability under the mixed motive analysis, Defendant must establish that the evaluation would have remained the same and participation in the IDP would have been required even absent the gender factor.

For this court's purposes, the performance ratings for the evaluation period of July 1990 to June 1991 are construed as satisfactory.[12] Defendant has offered no evidence that any other employee was *required* to participate in an IDP if a satisfactory evaluation was achieved. In Plaintiff's case, her participation in the IDP was a reason to support a negative decision and a basis for denying her a promotion to dual-rate or temporary work leader.

Having forced the IDP upon Plaintiff, the evidence discloses the IDP was a sham since management's participation was minimal at best. It is undisputed Plaintiff's completion of the course work was highly satisfactory. However, management did not acknowledge that success by issuing certifications as were promised under the program. Additionally, there was no evidence management provided

---

9. It is interesting to note that this assignment was subsequent to Mr. Kimball's request that she accompany him to San Francisco on business and share a room.

10. The court also notes that during the time spent on this administrative task, Plaintiff was not assigned to any electrical work or training that could have ultimately had a positive affect on her job performance evaluations. If management chooses to use a trained electrician for secretarial tasks, then management has a corresponding duty to make adjustments in future job evaluations. Stated differently, the secretarial assignment removed the employee from trainee status with a direct result that management positioned her for failure.

11. The persuasiveness of the mixed motive analysis has been question in *St. Mary's v. Hicks,* —— U.S. ——, 113 S.Ct. 2742, 125 L.Ed.2d 407, 61 U.S.L.W. 4782 (1993).

12. Under this analysis, it is unnecessary to address Plaintiff's contention she was discriminated against by management's unfair job performance evaluation in 1991.

any on-the-job training except for one instance involving Mr. Knisely in August 1992. At that time, management was unable to provide Mr. Knisely with objective criteria that were to be accomplished by the training. Therefore, the court concludes management did not intend to provide the necessary training to improve Plaintiff's performance and, thus, their reasons for imposing the IDP were pretextual. No male electricians were required to participate in an IDP if job performance was satisfactory. To the contrary, an IDP traditionally was viewed by McNary management as a voluntary means to improve performance and as a basis for promotion, as demonstrated by Mr. Allison's own participation in such a program. Therefore, Defendant's argument lacks merit. No other explanation is left other than gender as a motivating factor. The court draws the inference that Plaintiff's required participation in the IDP was disparate treatment motivated by gender. *See Shager v. Upjohn*, 913 F.2d 398, 401 (7th Cir.1990).

 Plaintiff alleges Defendant discriminated against her when she was pre-disqualified for the dual-rate position and her voluntary offer to accept a temporary work leader position was rejected. An electrician selected for either position was required to demonstrate leadership capabilities. Other than that requirement, the selection was made on the basis of management's subjective factors. When subjective factors are used, the procedure must "be closely scrutinized because of ... susceptibility to discriminatory abuse." *Royal v. Missouri Highway and Transportation Comm'n.*, 655 F.2d 159, 164 (8th Cir.1981).

> When the evaluation is in any degree subjective and when the evaluators themselves are not members of the protected minority, the legitimacy and nondiscriminatory basis of the articulated reason for the decision should be subject to particularly close scrutiny by the trial judge.

Certainly, Plaintiff lacked the extensive experience of Messrs. Knisely, Medley, Slead or Scheuerlein. However, Plaintiff's journey skills were comparable to those of Mr. Butterfield, as testified by Defendant's witness Herb Scheuerlein and admitted by Mr. Butterfield. Mr. Butterfield was encouraged to apply for the dual-rate position and was appointed temporary work leader. Additionally, the quality of Plaintiff's skills also were described by co-workers who testified she was as qualified as any journey electrician. Mr. Slead evaluated those skills as satisfactory in November 1991, just prior to the dual-rate announcement. He reiterated that conclusion to the EEOC investigator Linda Nutt in late December 1991. Moreover, Plaintiff had been assigned successfully to train electricians new to the plant.

The court concludes management had a legal obligation to consider Plaintiff for the same dual-rate position offered to Mr. Butterfield. Because management did not, Defendant has not rebutted successfully Plaintiff's contention gender played a role in the decision to pre-disqualify Plaintiff from those positions. The court concludes an inference is raised the decision to pre-disqualify Plaintiff was motivated in part by gender bias.

 Plaintiff also contends a discriminatory intent was shown by Plaintiff's long term assignment to sort electrical parts in the storage room. The court finds this assignment was not comparable to the "Friday housekeeping" assignments made to the male electricians. Rather, the parts sorting task was a long-term, forty-hour a week chore that did not involve any routine electrical tasks or training. Management responds the assignment was given because of Plaintiff's requirement she be assigned to light duty after her return to work following surgery. However, the evidence was undisputed some of the parts to be sorted weighed in excess of twenty pounds and required lifting. Additionally, management reassigned Plaintiff to do preventive maintenance work on the breakers during this time period, a regular task assigned to journey electricians, and then returned her to parts storage for another extended term. Moreover, the parts storage assignment continued for two weeks after Plaintiff was released by her doctor from light duty status. Mr. Slead stated the reason for continuing Plaintiff at that task was to finish the job, but there was testimony the job has yet to be finished. (Tr. at 304.) The task was characterized as the equivalent of

"making coffee." (Tr. at 307.) The court concludes the light duty rationale offered by Defendant was pretextual, and the disparate treatment was motivated by gender.

■ Plaintiff also relies on several circumstances that the court concludes do not demonstrate a discriminatory intent. First, Plaintiff claims Defendant discriminated against her when the leave abuse letter was issued to her in September 1991. The court concludes this act was not motivated by discriminatory intent. Rather, Plaintiff's use of leave in August 1991 to participate in parental activities with her son, while laudatory from a parental standpoint, was a sufficient basis for management to question whether her decisions regarding leave use were reasonable in light of her leave record. Credible testimony also sufficiently demonstrated other male employees were treated in a similar fashion.

Similarly, Plaintiff claims management discriminated against her when it refused to provide her with a copy of the job announcement for the dual-rated position. Management claims it did not intend to discriminate, but failed to provide the notice because Plaintiff was not at work the week the notices were distributed.

■ There is no inference the failure to provide a job announcement was motivated by discriminatory intent. It is undisputed a copy was designated for Plaintiff; the only dispute is the motive behind Defendant's failure to deliver it to her. It also is undisputed Plaintiff was included at the meeting on December 17 when the dual-rate vacancy position was discussed. Thus, any information on the announcement was made available to Plaintiff at the meeting.[13] Mr. Slead stated he did not feel it was important to provide an application because his impression was that Plaintiff had decided not to apply for the position. The court concludes Plaintiff has failed to prove by a preponderance of the

evidence the failure to provide a copy of the job announcement or application for the dual rate position was motivated in part by an intent to discriminate. If so motivated, the court concludes the failure to provide the job announcement and application were not the cause of any damage sustained by Plaintiff as the result of Defendant's discriminatory conduct.

■ Finally, Plaintiff asserts Defendant subjected her to unsafe working conditions because of her gender. Those conditions included working in areas infested with spiders despite her allergy to spider bites, being assigned to work on an X–J breaker without the assistance of a second electrician in violation of safety regulations, and being assigned to repair solar outhouses during the summer of 1992. The court concludes that, although these three assignments may have presented a direct threat to Plaintiff's health and safety, they were not motivated by gender.

It is undisputed McNary Dam is heavily infested with spiders, particularly during the summer months. Management provides its employees with aerosol sprays and brooms to kill the spiders. Although there is some evidence Plaintiff told management of her allergy to spiders at safety meetings, there was no notation on her health card that would preclude her from working in a spider-infested area. (Ex. 132, 133.) Given the pervasiveness of the spider problem at the job site, the court cannot conclude Plaintiff's assignment to work in a spider-infested area was an act motivated by gender. Indeed, after Plaintiff refused to complete one assignment because of spiders, there were no direct repercussions by management.

The X–J breaker assignment is more problematic. Regulations require that work in a remote job site be done by at least two electricians. (Ex. 1.) However, Mr. Scheuerlein and Mr. Medley stated they had worked on X–J breakers by themselves. The trouble report directed Plaintiff to inves-

---

13. The court also concludes had Plaintiff submitted an application, she would not have been selected for the position; thus, acquiring the job announcement and completing the application were futile acts under *International Brotherhood of Teamsters*, 431 U.S. at 365–66, 97 S.Ct. at 1869–70. As noted further in that opinion, a non-applicant, relying on the doctrine of futility, must present the court with the same information regarding qualifications that would have been presented on an application. *Id.* at 369 n. 53, 97 S.Ct. at 1872 n. 53. This court concludes Plaintiff was as qualified as fellow electrician Jim Butterfield.

tigate problems with an alarm system. In analyzing the task, Mr. Knisely indicated Plaintiff would have been required to enter the breaker and reset the switch. (Tr. at 382.) However, depending on the severity of the situation, the matter could have been postponed until the preventive maintenance. Defendant claims Plaintiff was to only check to see if the power to the breakers could be shut off to allow the repair to be made. Mr. Slead also stated he recalls telling Plaintiff if she needed help, he would assign a second electrician to help her. After checking with the power operator, it was determined power could not be shut off, so repairs were postponed. Because this incident did not result in any adverse consequence to Plaintiff, the court concludes Defendant's reason was not pretextual and that there is insufficient evidence to demonstrate gender-based motivation. Moreover, if the incident was gender based, it was not the cause of any damage sustained by Plaintiff.

Plaintiff contends she was discriminated against when she was assigned to work in the solar outhouses during the summer of 1992. However, her assistant was male and there was testimony other male electricians worked there. Thus, the court concludes there is no evidence of discriminatory motive arising from this incident.

Finally, in reviewing the evidence of disparate treatment as a whole, the court is struck by management's failure to provide a supportive working environment for Plaintiff. Very little on-the-job training was provided despite assurances such training would be forthcoming. Management was quick to assign blame for error to Plaintiff without confirming she was the one in charge. When other electricians committed errors, those errors did not result in poor performance evaluations.

Plaintiff was assigned to menial tasks that took her away from her trade for significant periods of time and, thus, she was denied an opportunity to become proficient at her job. There were no efforts by management to make the IDP successful; in fact, it was used as a negative circumstance to deny Plaintiff supervisory opportunities even though other personnel had used IDPs as a stepping stone to promotion.

There is no evidence management provided its employees with any training regarding their responsibilities toward a member of a minority; training provided to midlevel management was minimal at best. There is evidence management was reluctant to deal with the EEOC counselor to improve Plaintiff's working environment. Rather, they adopted a defensive posture that did little to help improve Plaintiff's performance or alleviate her special concerns. Management characterized Plaintiff as a "tool box electrician" (one who was comfortable only in the role of an assistant electrician) (Tr. at 208), yet offered her little or no assistance to improve her skills. Mr. Allison admitted he was checking on Plaintiff's work himself, even though Plaintiff was under Mr. Slead's supervision. There is no evidence Mr. Allison made any efforts to ensure Plaintiff's success at the dam. Rather, he viewed her as the "token EEO hire" from a list of mediocre candidates and EEOC involvement at the dam as an interference with his management style. (Tr. at 207, 216.) As project director of a federal project, he has a legal duty to lead by example.[14] 32 C.F.R. § 191.4. This he failed to do, even through 1992 when it would have made sense to provide support to assist Plaintiff, rather than setting her up for failure.

Finally, the court notes Plaintiff, as a journey electrician, should not be held to the skill

14. Federal agencies and other public employers should set an example for diversity in employment matters. Many employers, both public and private, have had to learn the hard way that perpetuating a lack of diversity is a bad business decision. *See, e.g., "Seeing the Light," Seattle Times/Seattle Post Intelligencer,* Scene, Sec. L, page 1, Sunday, September 19, 1993. A quote from that article is instructive: "Since 1985, 60% of City Light's hires have been women or minorities.... Of Seattle City Light's 1858

workers, 36.6% are women, 29.9% are minorities. More telling: 70% of the sixty people enrolled in four-year apprenticeship programs are women and/or minorities." Seattle City Light is now a leader in minority hiring practices among utilities following "two decades of discrimination and harassment suits or complaints," including a $315,000 judgment for ignoring a sexual harassment claim. The court notes that currently, there are no females employed in the trades at McNary Dam.

level of the more experienced electricians, Messrs. Medley, Knisely, Slead and Scheuerlein. Rather, she must be compared to the other electricians of her skill level. The overwhelming evidence is that Plaintiff met this standard. Thus, the fact her career was not as successful as others in the electrical shop compels the finding Defendant was deficient in its responsibility to avoid placing roadblocks to her success. In fact, management offered no evidence of any trade member having received an unsuccessful job performance evaluation. Having determined disparate treatment occurred, the court also concludes, by virtue of the direct and indirect evidence discussed above, the reason for management's perception of her performance as deficient, was gender based.

## HOSTILE ENVIRONMENT

A gender discrimination complaint may also be based upon proof of a hostile environment. In *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), the Supreme Court noted Plaintiff must show that she was subjected to "sexual advances, requests for sexual favors, [or] other verbal or physical conduct of a sexual nature," *Id.* at 65, 106 S.Ct. at 2404 (quoting Equal Employment Opportunity Commission Guidelines, 29 C.F.R. § 1604.11(a)); that the conduct was unwelcome; and that the conduct was "sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" *Id.* at 67, 106 S.Ct. at 2405, citing *Henson v. City of Dundee,* 682 F.2d 897, 904 (11th Cir.1982). *See also Jordan v. Clark,* 847 F.2d 1368, 1373 (9th Cir.1988), *cert. denied,* 488 U.S. 1006, 109 S.Ct. 786, 102 L.Ed.2d 778 (1989). The required showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness or frequency of the conduct. *Ellison v. Brady,* 924 F.2d 872, 878 (9th Cir.1991), citing *King v. Board of Regents of University of Wisconsin System,* 898 F.2d 533, 537 (7th Cir.1990). In evaluating the severity and pervasiveness of sexual harassment, the court must focus on the perspective of the victim. A prima facie case of hostile environment is established if the conduct is such that a "reasonable woman" would consider it sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment. *Brady,* at 879. Thus, to avoid liability under Title VII, employers are duty bound to educate and sensitize their workforce to eliminate conduct which a reasonable victim would consider unlawful sexual harassment. *Id.* at 880.

There are two instances which involve conduct that was sexually suggestive. First, Plaintiff's supervisor asked her to accompany him to San Francisco and share a room. Second, medical records indicate Plaintiff received a sexually explicit card at her home from a co-worker at McNary. Viewing these instances from the perspective of the reasonable woman, they are insufficient, as a matter of law, to establish a sexual harassment or hostile environment claim.

## VENUE

At the close of Plaintiff's case in chief, Defendant moved for dismissal based on improper venue pursuant to 28 U.S.C. § 1402(b), contending the Federal Tort Claims Act (FTCA) requires that such a tort claim be brought in the jurisdiction where the Plaintiff resides or the acts occurred. Here, Oregon is the situs of both the negligent acts and Plaintiff's residence. Plaintiff responds, and the court agrees, that failure to raise this affirmative defense prior to the filing of a summary judgment motion and/or trial is deemed a waiver of the defense and jurisdiction is proper in the district where the action is brought. 28 U.S.C. § 1406(b); *Misch, on Behalf of Estate of Misch v. Zee Enterprises, Inc.,* 879 F.2d 628, 631–32 (9th Cir.1989); Fed.R.Civ.P. 12(h).

## FTCA CLAIM

Plaintiff seeks damages for the negligent infliction of emotional distress under the FTCA. The parties agree that any tort claim is controlled by Oregon law.

Defendants first argue such a claim is barred by the Federal Employees Compensation Act (FECA), the exclusive remedy for on-the-job injury or disability. *See 5*

U.S.C. § 8116(c). If there is a "substantial question" whether a claimant is entitled to FECA coverage, any tort claim is stayed by the district court pending a determination by the Secretary of Labor as to the compensation claim. Here, Plaintiff's worker compensation claim was rejected by the Secretary of Labor, whose representative noted an EEOC action was pending in this court. (Ex. 35.) That representative further noted Plaintiff had failed to establish she sustained an emotional condition on or about June 4, 1991, in the performance of her duty. Furthermore, in this circuit, a federal employee who seeks compensation for emotional distress is not required to submit a claim to the Secretary of Labor before filing suit under the FTCA since the FECA does not compensate emotional injury. *Sheehan v. United States,* 896 F.2d 1168, 1174 (9th Cir.1989), amended at 917 F.2d 424 (1990). Thus, any tort claim is not barred by the FECA.

■ Defendant also argues Plaintiff's tort claim is barred by the exclusive remedy provided under the Civil Service Reform Act[15] (CSRA), citing *Rivera v. United States,* 924 F.2d 948 (9th Cir.1991). In *Rivera,* a federal employee filed a claim after being subject to retaliatory verbal abuse and adverse personnel actions. The abuse continued causing severe emotional distress and physical harm to the employee until she was forced to quit her job. The employee filed an administrative claim with the United States government, a prerequisite to suit under the FTCA. *See* 28 U.S.C. § 2675(a) (1988). No relief was sought through the administrative scheme established by the CSRA, which permits federal employees to challenge prohibited personnel practices by their supervisors. 5 U.S.C. § 2302. The definition of personnel action includes a performance evaluation, a decision concerning training, or any significant change in duties or responsibilities which is inconsistent with the employee's salary or grade level. The act also provides that any collective bargaining agreement must contain a grievance procedure that culminates in binding arbitration. 5 U.S.C. § 7121. *Rivera,* citing *Lehman v. Morrissey,* 779 F.2d 526, 527–28 (9th Cir.1985)

(CSRA preempts common law tort claim), noted at 951, "in enacting the CSRA Congress meant to limit the remedies of federal employees bringing claims closely intertwined with their conditions of employment to those remedies provided in the statute." *Rivera,* at 952, concluded the federal employee had no right for damages under the FTCA and that her exclusive remedy was through the CSRA. This court agrees Plaintiff's claim for negligent infliction of emotional distress under the FTCA must be dismissed. *See also Schweiker v. Chilicky,* 487 U.S. 412, 421, 108 S.Ct. 2460, 2466, 101 L.Ed.2d 370 (1988); *Bush v. Lucas,* 462 U.S. 367, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983) (no first amendment *Bivens* claim if CSRA available); *United States v. Fausto,* 484 U.S. 439, 108 S.Ct. 668, 98 L.Ed.2d 830 (1988) (back pay claim in the United States Court of Claims under Tucker Act precluded by remedy under CSRA); and *Saul v. United States,* 928 F.2d 829, 842–43 (9th Cir.1991) (state common law tort claim preempted by CSRA, even though claim bears no connection to employee's pay); *Kotarski v. Cooper,* 866 F.2d 311, 312 (9th Cir.1989) (no *Bivens* claim available to federal employee because of relief under CSRA).

## DAMAGES

Having concluded Plaintiff met her ultimate burden of persuasion of showing Defendant's liability for damages caused by disparate treatment, the court must now address the issue of damages.

■ The court has wide discretion in awarding remedies to make a Title VII plaintiff whole. *Edwards v. Occidental Chemical Corp.,* 892 F.2d 1442, 1448 (9th Cir.1990), citing *Thomas v. City of El Segundo,* 802 F.2d 1131, 1133 (9th Cir.1986). Under 42 U.S.C. § 2000e–5(g), the court may award such equitable relief as is warranted, including back and front pay, value of lost benefits, or reinstatement. Although reinstatement is preferable to an award of front pay, the law recognizes certain instances where reinstatement is not feasible, including continuing hostility between the employer and employee

---

**15.** Pub.L. No. 95–454, 92 Stat. 1111 (codified as amended in scattered sections of 5 U.S.C.).

or the lack of an available position. *See Cassino v. Reichhold Chemicals, Inc.,* 817 F.2d 1338, 1346 (9th Cir.1987), *cert. ·denied,* 484 U.S. 1047, 108 S.Ct. 785, 98 L.Ed.2d 870 (1988) (involving an· analysis of front pay damages in an age discrimination setting).

■ The court concludes the following damages are authorized under Title VII and have been proven by Plaintiff: First, Plaintiff is entitled to full back pay and benefits from September 1, 1992, until December 1993,[16] for a total of $51,770.[17] Any public assistance benefits received by Plaintiff during this time shall not be deducted from the award of back pay.

Second, the court concludes that because of Plaintiff's state of health, she is on leave-without-pay status, and reinstatement at this time is not an alternative. Plaintiff, with the assistance of Dr. Johnson, needs a period of time to address and heal the emotional damage caused by Defendant. The medical evidence demonstrates Plaintiff must undergo intensive therapy for a period of two years and, therefore, any return to work is not feasible until November 1, 1995. Therefore, Plaintiff is entitled to front pay for two years, commencing November 1, 1993, to November 1, 1995, for a total of $108,246.[18] At that time, Plaintiff will have the option of returning to work with Defendant or making alternative plans.

Mitigation is also an element of determining front pay damage. *Edwards,* 892 F.2d at 1448. Because Plaintiff has not yet received any·worker's compensation benefits and will not be eligible for public assistance for the next two years, the issue of offset need not be addressed.

■ Under the Civil Rights Act of 1991, P.L. 102–166, Title I, § 102, 105 Stat. 1072, codified at 42 U.S.C. § 1981a(a)(1), Plaintiff is entitled to compensatory damages. However, compensatory damages are available only in those ·instances involving disparate treatment as evidenced by a single motive; compensatory damages are not available in claims involving disparate treatment with mixed motive discrimination, or disparate impact. Compensatory damages are defined to include future pecuniary loss, emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses. 42 U.S.C. § 1981a(b)(3). Compensatory damages under this section do not include back pay or interest on back pay. 42 U.S.C. § 1981a(b).

In addressing this issue, the court is mindful of its findings and conclusions that aspects of Defendant's liability encompass both single and mixed motive analyses and that events leading to Plaintiff's lawsuit occurred both ·before and after November 21, 1991, the effective date of the 1991 Civil Rights Act. However, the court concludes the evidence demonstrates the more predominant damage to Plaintiff's emotional health occurred after November 21, 1991.[19] Based on this finding, the court limits its compensatory award to injury and damages occurring after that date.

Certain aspects of Dr. Johnson's testimony are very credible and other aspects less credible. Similarly, the court finds certain aspects of the. testimony of Verne Cressey, M.D., to be very credible and other aspects less credible. It is noteworthy, however, that both experts agreed most of Plaintiff's

---

16. The court relies on Dr. Barnes' computations for determining the appropriate amount of back pay, based on his presumption this opinion would not be issued until December 1993. However, because the court is awarding front pay, any disparity in the dates encompassed by the back pay award would not result in a change in· the total amount of wages awarded.

17. This figure represents $46,162 back pay and $5,608 back benefits as testified by Dr. Barnes. No prejudgment interest is awarded because Defendant is a public entity.

18. To arrive at this figure, the court increased Plaintiff's back pay and back benefits award by 3% for 1994 ($53,323) and 1995 ($54,923). The court has not reduced this amount to present value because of the de minimis effect of such a reduction, given the present rate of inflation, interest rates and the fact the front pay encompasses only the next two years.

19. Having made this finding, the court does not address the issue of retroactivity, an issue now before the United States Supreme Court.

"self-esteem eggs" are placed by her into her "work basket."[20] Therefore, the court concludes Plaintiff's current mental and emotional conditions are a direct and proximate result of Defendant's discriminatory conduct. Based on this finding, Defendant shall pay the costs associated with Dr. Johnson's care from the date of Plaintiff's first consultation until today's date, totalling $2,984.50. Additionally, Defendant shall pay $4,200 for past medications necessarily prescribed by Dr. Johnson.

Based on Dr. Johnson's testimony regarding Plaintiff's anticipated need for future psychiatric care, Defendant shall pay for the cost of two sessions per month for two years, or 48 sessions at $115 per hour, totalling $5,520. Defendant shall pay for future medication costs in the amount of $350 per month for two years, for a total of $8,400.

Clearly, Plaintiff has been severely affected emotionally from Defendant's conduct and that injury is manifested by serious physical impairments. However, the court concludes, in contrast to Dr. Johnson's testimony, that Plaintiff's personal, non-Corps life experiences have impacted her more than "minimally." For example, her treatment by the Navy was outrageous. It was only after five other women experienced the same outrageous treatment that the Navy finally reacted. Yet, Ms. Bartlett cannot be and is not compensated through this lawsuit for the serious emotional damages she received as a result of sexual harassment during her tour at China Lake.

Additionally, there can be no dispute that losing her father and brother-in-law in the same week, and the serious physical spousal abuse suffered at the hands of her former husband, caused Plaintiff emotional damage. However, the impact from these unfortunate life experiences cannot and have not been compensated through this lawsuit. Thus, the court concludes any expenses associated with Plaintiff's medical condition and treatment prior to November 21, 1991, (those services

rendered by Drs. Rakozy, Farnes and Fisher) were caused by factors other than Defendant's conduct and, therefore, will not be compensated through this lawsuit.

Finally, it is the conclusion of this court that Ms. Bartlett is entitled to $25,000 compensatory damages for the emotional distress suffered as a result of the single motive disparate treatment by Defendant. Accordingly, Plaintiff's damages total $206,120.50.

**IT IS ORDERED:**

1. That the Clerk is directed to enter judgment for Plaintiff on her disparate treatment claims, as earlier discussed, in the amount of $206,120.50, plus her costs.

2. Plaintiff's FTCA claim is **DISMISSED.**

3. The issue of attorney fees and the costs associated with expert witness fees shall be addressed by motion with supporting memorandum and affidavits to be filed no later than thirty (30) days from the date of this Opinion. The response, if any, shall be filed and served within fifteen (15) days of service of the fee motion and supporting materials, and the reply, if any, shall be filed and served within ten (10) days of service of the response. The matter will be deemed submitted without oral argument five days following receipt of the reply.

4. The Clerk is directed to enter this Order and provide copies to counsel for Plaintiff and Defendant.

---

**20.** Dr. Johnson so stated during his video testimony. Dr. Cressey, in response to a question by the court, agreed with Dr. Johnson's evaluation in this respect.